IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

**DR. TAYAB WASEEM,**
    *Plaintiff,*

v.                              CIVIL NO. _____

**MOHAMMAD EMAD MOSTAQUE,**     JURY TRIAL DEMANDED

**STABILITY AI, INC.,**
    a Delaware Corporation

and

**STABILITY AI LTD.,**
    a UK corporation,

    *Defendants.*

## COMPLAINT

Dr. Tayab Waseem, M.D., Ph.D. ("Dr. Waseem"), by counsel, submits this Complaint against Defendants Mohammad Emad Mostaque ("Mostaque"), Stability AI, Inc., and Stability AI Ltd. (together, "Stability AI") (collectively, "Defendants") seeking recognition of Dr. Waseem's 10% equity interest in Stability AI, or in the alternative, damages for the value of that interest and work performed by Dr. Waseem for Stability AI.

### INTRODUCTION

1. Dr. Waseem is a computational biologist who specializes in integrating emerging technologies into medicine, research, public policy, and venture capital. From July 2020 through July 2021, Dr. Waseem served as Chief Scientific Officer of Stability AI, a company that holds itself out as a world leader in open-source generative artificial intelligence ("AI"). Dr. Waseem drastically altered his medical training to kick-start Stability AI with Mostaque, Stability AI's

1

CEO. As Chief Scientific Officer, Dr. Waseem worked more than full time for Stability AI, spending countless hours working to get the company off the ground. Dr. Waseem drafted numerous proposals for grant applications and projects, met with the investors, secured crucial funding for the company, and supervised contractors. The Company publicly touted him as an officer of the Company and he worked with the Company's other cofounders to finance the Company. Dr. Waseem even spent thousands of dollars to cover the Company's expenses. Dr. Waseem's efforts to develop, fundraise, market, and advance the young company were critical for its development.

2. In exchange for the work performed by Dr. Waseem, Defendants agreed that Dr. Waseem would receive 10% of common stock in Stability AI, vested immediately. In July 2021, Dr. Waseem took a leave of absence from Stability AI to complete medical school, as agreed to by Defendants. When Dr. Waseem attempted to return to Stability AI following completion of his clinical year, Defendants wrongfully cut-out Dr. Waseem from the company, denied him his 10% ownership interest, and failed to compensate him for any of the work he performed for Stability AI. As a result of Defendants' breach of the parties' agreement and wrongful conduct, Dr. Waseem has suffered significant damages.

**PARTIES, JURISDICTION, AND VENUE**

3. Dr. Waseem is a Virginia citizen who currently resides in Alexandria, Virginia. At the time of the events giving rise to this dispute, Dr. Waseem resided in Norfolk, Virginia.

4. Mostaque is not a Virginia Citizen. On information and belief, Mostaque is a citizen of the United Kingdom and resides in London, England. Mostaque is a former hedge fund manager, and at all relevant times the CEO and board member of Stability AI, Inc. and Stability AI Ltd.

5. Stability AI, Inc. is a Delaware corporation with its principal place of business located at 88 Notting Hill Gate, London, England, W11 3HP. Stability AI, Inc. is a party to the unlawful conduct alleged herein. Stability AI, Inc. conducts business in this judicial district.

6. Defendant Stability AI Ltd. is a UK corporation with its principal place of business located at 88 Notting Hill Gate, London, England, W11 3HP. Stability AI Ltd. conducts business in this judicial district. On information and belief, Defendant Stability AI Ltd. is a wholly owned subsidiary of Defendant Stability AI, Inc.

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.

8. This Court has personal jurisdiction over Mostaque, Stability AI, Inc. and Stability AI Ltd. because they all transacted business in the Commonwealth, contracted to supply services or things in this Commonwealth, maintained substantial contacts, and/or committed acts that harmed Dr. Waseem in this District and division. Defendants' conduct has had the intended and foreseeable effect of causing injury to Dr. Waseem who resides in this District. As alleged herein, the Defendants through Mostaque engaged Dr. Waseem to perform work for the Defendants in Virginia, had regular meetings and phone calls with Dr. Waseem while he was in Virginia, and used Dr. Waseem's address in Norfolk, Virginia as Stability AI's U.S. address.

9. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.

### DR. WASEEM MEETS MOSTAQUE AND BEGINS WORKING WITH STABILITY AI

10. Dr. Waseem is the son of immigrants from Pakistan. His father was a cab driver and his mother worked in a school cafeteria. They worked hard to put Dr. Waseem through school. Dr. Waseem holds four degrees—two bachelor's degrees in Biology and Bioinformatics from

3

Virginia Commonwealth University, a Ph.D. in Immunology from Eastern Virginia Medical School ("EVMS"), and an M.D. from EVMS.  He is currently an Emergency Medicine resident at George Washington University hospital.

11. Dr. Waseem has done fellowships in public policy and venture capital.  He serves on several biomedical and health technology boards and is well respected on the global stage with over 100 peer-reviewed publications, articles, presentations, and lectures. He has served as a technical expert for the World Health Organization (the "WHO"), a lead reviewer for the National Science Foundation, and a reviewer for multiple journals.  His unique blend of expertise in biomedical research, medicine, big data, venture capital, and policy has made him a highly sought-after consultant and keynote speaker for many groups including the WHO, the United Nations, medical societies, and the White House Office of Science and Technology Policy.

12. In 2020, Dr. Waseem led a scientist task force to harness emerging technologies, including AI, to expedite research and development, sponsored by the White House Office of Science and Technology Policy.  The task force's purpose was to use machine learning to develop an automated literature evaluation toolset for the medical research community to swiftly develop treatment protocols, vaccines, and stop the spread of the virus. Dr. Waseem was the AI-literature reviews projects lead where he led a group of over 150 medical and scientific volunteers across 30 institutes and five countries. The group used the CORD-19 data set, considered the largest single collection to date with 128,000 published articles and preprints, including at least 38,000 published just this year, and advanced natural language processing to expedite the analysis of disparate volumes of research in real-time to aid in mitigation of COVID-19.

13. Through this work, Dr. Waseem connected with Mostaque, who spearheaded an initiative called the Collective & Augmented Intelligence Against COVID-19 ("CAIAC"). This coalition worked to build a platform using AI to guide COVID-19 decision-making.

14. As an immunologist with a background in big data and technology, Dr. Waseem had numerous opportunities to use his skills in the fight against the global pandemic. Dr. Waseem saw the opportunity that Stability AI presented both in fighting COVID-19 and the burgeoning field of artificial intelligence. Dr. Waseem and Mostaque discussed joining forces to work on AI, with an initial focus on COVID-19 and CAIAC. At the time, Mostaque had already formed Stability AI Ltd. in the UK, and he asked Dr. Waseem if he would prefer to work for Stability AI or CAIAC. Dr. Waseem chose Stability AI, and asked for a leadership position. Mostaque gave Dr. Waseem the title of Chief Scientific Officer. In engaging Dr. Waseem to work for them, the Defendants agreed and expected that Dr. Waseem would perform his work from his home in Virginia.

15. Dr. Waseem started work for Stability AI as its Chief Scientific Officer in late July 2020. Dr. Waseem agreed to drastically alter his medical training, including delaying taking his medical board exams so he could work for Stability AI, with the understanding that he would take temporary leave from Stability AI the following year to complete his medical degree. Mostaque understood and agreed to this.

16. Dr. Waseem immediately set to work on Stability AI's various initiatives. He received a Stability AI email address at the web domain the Stability AI continues to use to this day ("@stability.ai"). As part of Stability AI's executive leadership team, Dr. Waseem participated in daily "stand up" meetings with Mostaque and Stability AI co-founder Cyrus Hodes ("Hodes") to discuss the management of Stability AI and its progress in its various initiatives. As

agreed and expected by the Defendants, Dr. Waseem attended these meetings from his home in Virginia.

17. Stability AI used Dr. Waseem's address in Norfolk, Virginia as its U.S. address for a period of time.

18. Initially, Mostaque told Dr. Waseem that he would receive cash compensation for his work for Stability AI. However, the Company's cash position quickly tightened and Mostaque assured Dr. Waseem that he would receive equity compensation for his work for Stability AI.

19. At its core, Stability AI's business plan was to develop generative AI models for a wide array of AI products. The Company's work on CAIAC was the first of those projects. Indeed, it was CAIAC's use of generative AI that set it apart from other technology projects aimed at combatting the pandemic.

20. In addition to working on CAIAC, Dr. Waseem managed Stability AI and its contract workers and wrote dozens of proposals for other projects both inside and outside of the healthcare space, all from his home in Virginia as intended by Defendants. One of these projects was the Trinity Challenge, a coalition focused on improving the use of data and analytics in response to health emergencies. Through the CAIAC and the Trinity Challenge, which Dr. Waseem was instrumental in developing, Stability AI received multiple revenue streams, which was critical for the Company. Stability AI used this funding to further develop its generative AI models as well as provide resources to other groups that were developing AI models.

21. Dr. Waseem wrote dozens of proposals and grant applications. Among these were an application for a Small Business Innovation Research (SBIR) grant, an application for a Health Data Research UK (HDR UK) grant, an X-prize proposal, a proposed AI project with the Saudi government, and a proposed project for the United Nations Development Programme.

22. Dr. Waseem prepared and spearheaded a successful grant application in the U.K., which provided funding for Stability AI to hire employees in the U.K. Through Dr. Waseem's work, Stability AI also received funding to hire employees and obtain computing resources.

23. On information and belief, Stability AI used the resources obtained through Dr. Waseem's efforts to further develop its generative AI models, including generative imaging, and provide resources to other groups that were developing AI models. Mostaque has stated publicly that Stability AI began working on text-to-image generation in late 2020 and early 2021, right when Dr. Waseem's efforts began bringing money into the Company. These funds were critical to Stability AI's development of its generative imaging technology. The creation of a text-to-image generator requires computers to train to recognize pictures and text through millions of computing transactions that require substantial computing power. On information and belief, in mid-2021, Mostaque used Company funds to purchase high-powered computer processors called tensor processing units ("TPUs") to power its machine learning. By April 2021, Mostaque internally shared early results of the generative imaging achieved using Stability AI resources, and by the fall 2021 Mostaque was sharing AI-generated images publicly.

24. Stability AI repeatedly held out Dr. Waseem as its Chief Scientific Officer and a co-founder. Stability AI made these representations in various grant applications and materials sent to investors.

25. For example, Stability AI listed Dr. Waseem as "Co-Founder and Chief Scientific Officer" in formal grant applications submitted to the United States federal government. Additionally, Stability AI listed Dr. Waseem as its CSO in grant applications, a memorandum of understanding with the city of Riyadh, and on the United States government's System for Award Management website, SAM.gov.

26. Dr. Waseem spoke at conferences on behalf of Stability AI, including the KSA Health Care Forum and the UN World Data Forum. Stability AI publicly touted Dr. Waseem's speaking engagements, referring to Dr. Waseem as Stability AI's Chief Scientific Officer[1]:



27. Like many executives/owners of startup companies, Dr. Waseem used his personal funds to help cover company expenses. Dr. Waseem spent approximately $11,000 of his own funds to cover certain company expenses, including to pay contract workers. Stability AI reimbursed Dr. Waseem for these expenses in or around November 2021.

---

[1] The shortened url http://ow.ly/dNOI50BVkz9 used in in Stability AI's tweet ("Dr. Tayab Waseem, Chief Scientific Officer for http://ow.ly/dNOI50BVkz9") linked directly to Stability AI's website https://stability.ai/.

28. Upon information and belief, Mostaque and Hodes took salaries and/or distributions from Stability AI while Dr. Waseem received no payments, except for the reimbursement for funds he provided to cover company expenses. Dr. Waseem did so because Mostaque repeatedly told him that he would receive equity compensation.

29. Like any new company, Stability AI needed funding. Together, Mostaque, Hodes, and Dr. Waseem drafted and presented an investment pitch deck to potential investors. In the pitch deck, Stability AI listed Dr. Waseem as one of its three leaders, alongside Mostaque and Hodes:



30. As is typical for most startups, the three leaders of Stability AI met with dozens of potential investors over several months to discuss potential investment in Stability AI. They sought $3 million through SAFE notes. During these meetings, Dr. Waseem was presented as and took on the role of a typical startup founder, and on information and belief, investors understood

Dr. Waseem to be an executive and co-founder of Stability AI. During these meetings, Mostaque touted Dr. Waseem's work for the White House Office of Science and Technology Policy, his background in computational biology and immunology, and his work for the World Health Organization as a technical expert on AI.

31. Dr. Waseem worked for Stability AI as its Chief Scientific Officer for approximately one year before taking an agreed upon leave to finish his clinical year of medical school.

### MOSTAQUE AND STABILITY AI AGREE TO GRANT DR. WASEEM A 10% EQUITY INTEREST

32. On information and belief, Mostaque formally incorporated Stability AI, Inc. in Delaware in October 2020. At this time, he transferred ownership of Stability AI, Ltd. from himself to Stability AI, Inc. Initially, Stability AI, Inc. had three shareholders: Mostaque, who owned approximately 70% of the equity of Stability AI, Inc., Hodes, who owned 15%, and a separate investor, who owned 15%. On information and belief, these shareholders' equity interests were immediately vested. On information and belief, Mostaque held complete control of Stability AI, Inc. as its sole director.

33. Mostaque and Dr. Waseem discussed compensating Dr. Waseem with equity, rather than a salary. Those discussions happened at various times over the course of several months. Eventually, in March 2021, on a zoom call with Mostaque and Hodes, Mostaque offered Dr. Waseem a 5% equity interest in Stability AI, Inc. in lieu of cash compensation for his efforts. Because Dr. Waseem had been working full-time for Stability AI since July for no cash compensation and was critical for completing the Company's flagship project, and because he delayed portions of medical school and board examinations to work for Stability AI, Dr. Waseem insisted that that he receive 10% of common stock and vest immediately. Mostaque and Hodes agreed.

34. Hodes and Mostaque confirmed Dr. Waseem's 10% equity interest in written messages to each other.

35. Dr. Waseem's shares would come from a 20% option pool Stability AI set aside when it started hiring employees.

36. Since Stability AI had cash flow issues and fell behind in paying its outside counsel, Mostaque told Dr. Waseem that Stability AI would wait to formally document Dr. Waseem's equity interest until the company received additional financing.

37. Given Mostaque's background as a hedge fund manager and his position as the Company's sole director, Dr. Waseem relied on Mostaque's judgment as to the timing of formally recording Dr. Waseem's equity interest, and Dr. Waseem expected Stability AI to honor the parties' agreement.  However, Mostaque never did so. Mostaque has since admitted in public statements that Stability had "flaws" in its record-keeping and had not historically prioritized the "systems and processes" underpinning the fast-growing startup.

38. Believing that Stability AI would fairly compensate Dr. Waseem with the agreed-upon equity for his work and contributions to the company, Dr. Waseem continued his work for Stability AI through the first half of 2021.  In July 2021, Dr. Waseem took leave from Stability AI to return to medical school, as the parties previously agreed and planned.

39. Mostaque knew and understood that Dr. Waseem would take leave from Stability AI to complete medical school and expected Dr. Waseem to continue working for Stability AI upon completion of his schooling. Indeed, before Dr. Waseem went on leave, Mostaque had discussions with Dr. Waseem regarding what type of compensation package Dr. Waseem would expect upon his return, in addition to his 10% equity interest.

40. Shortly after Dr. Waseem returned to medical school, Mostaque messaged him to tell him that Hodes was leaving the Company and that Mostaque was streamlining things as the Trinity project and CAIAC projects were winding down. Knowing that Dr. Waseem would return to work for Stability AI, Mostaque also told Dr. Waseem that he should download his emails from his @stability.ai account so that Dr. Waseem would have access to them upon his return.

### DEFENDANTS BREACH THEIR AGREEMENT WITH DR. WASEEM

41. Dr. Waseem completed his clinical year of medical school in the fall of 2022. Shortly thereafter, he reached out to Mostaque to discuss his return to Stability AI and his compensation.

42. On or about October 3, 2022, Dr. Waseem and Mostaque had a telephone conversation during which Dr. Waseem raised the issue of his equity ownership in Stability AI. Mostaque did not dispute Dr. Waseem's ownership, and the two agreed they would follow up on it and Dr. Waseem's role with Stability AI.

43. Over the next two months, Dr. Waseem repeatedly reached out to Mostaque, but Mostaque stopped responding. In November 2022, Dr. Waseem sent an email to Mostaque reminding him of his agreement with Stability AI for his vested 10% equity interest. Mostaque did not dispute this. Instead, he refused to respond to Dr. Waseem. Mostaque continued to ignore Dr. Waseem, forcing Dr. Waseem to engage counsel to pursue his rights to the equity compensation the parties agreed to.

44. In January 2023, Stability AI claimed—for the first time—that Defendants never agreed to give Dr. Waseem equity in the company. Stability AI further denied that it even employed Dr. Waseem. Rather, Stability AI claimed Dr. Waseem agreed to work as an unpaid

intern—a laughable position repeatedly contradicted by Stability AI's own public statements, investor pitch decks, and internal documents that tout Dr. Waseem as Chief Scientific Officer.

45. Despite repeated demands, Dr. Waseem has not received his 10% equity interest or any compensation for the work he performed for Stability AI. Defendants' refusal to honor the parties' agreement regarding Dr. Waseem's equity and failure to compensate Dr. Waseem for any of the work he performed has forced Dr. Waseem to initiate this legal action.

46. This suit seeks confirmation of Dr. Waseem's 10% equity interest in Stability AI, or in the alternative, compensation for the critical work performed by Dr. Waseem for Stability AI during the company's founding stages.

47. Although Dr. Waseem's contributions played a crucial role in Stability AI's success, Defendants knowingly refuse to honor their agreement with Dr. Waseem, have wrongfully cut-out Dr. Waseem from the company, denied him his 10% ownership interest in Stability AI, and failed to compensate him for any of the work Dr. Waseem performed for Stability AI.

## COUNT ONE
### (BREACH OF CONTRACT)
### (STABILITY AI)

48. All allegations made in prior paragraphs are incorporated by reference.

49. On or about March 19, 2021, Dr. Waseem entered into a binding agreement with Stability AI by and through its CEO and sole director, Mostaque.

50. The terms of the agreement provided that in exchange for all work performed by Dr. Waseem for Stability AI and his delay of portions of medical school, Dr. Waseem would receive common stock amounting to 10% equity interest in Stability AI, vested immediately.

51. Dr. Waseem performed all of his obligations under the parties' agreement.

52. Stability AI materially breached the agreement by cutting Dr. Waseem out of the company and denying him his 10% equity interest in Stability AI.

53. Stability AI acted in bad faith by refusing to recognize work performed by Dr. Waseem as Chief Scientific Officer of Stability AI, attempting recharacterize his role in Stability AI as that of an intern, and by refusing to honor the parties' agreement concerning Dr. Waseem's equity interest. Stability AI's wrongful conduct also amounts to a breach of the implied covenant of good faith and fair dealing.

54. As a direct and proximate result of Stability AI's breach of the agreement, Dr. Waseem has been damaged in an amount to be proven at trial.

## COUNT TWO
### (UNJUST ENRICHMENT - IN THE ALTERNATIVE TO COUNTS I AND III (ALL DEFENDANTS)

55. All allegations made in prior paragraphs are incorporated by reference, except to the extent inconsistent with the relief requested herein.

56. Dr. Waseem conferred a valuable benefit on Defendants by delaying portions of medical school, turning down other opportunities, and committing his skills, experience, and business network to Defendants, as described herein.

57. In recognition for taking comparable risks, developing the business strategy, and bringing his skill and experience to Stability AI, Dr. Waseem reasonably expected to receive compensation of a 10% equity interest.

58. In agreeing to compensate Dr. Waseem with a 10% equity interest, Defendants understood and agreed that 10% equity interest to be the value of the benefit Dr. Waseem was providing. Defendants knew or reasonably should have known that Dr. Waseem expected compensation for the work and services he provided to Stability AI.

59. Defendants accepted and benefited from all work and services provided by Dr. Waseem between July 2020 and July 2021.

60. Defendants wrongfully and intentionally refuse to compensate Dr. Waseem for any of the work or services he provided to Stability AI between July 2020 and July 2021.

61. Consequently, Defendants have been unjustly enriched by the benefits conferred on them by Dr. Waseem.

62. Dr. Waseem is entitled to recover an amount to be proven at trial for the reasonable value of the work he performed and services provided to Stability AI between July 2020 and July 2021.

### COUNT THREE
### QUANTUM MERUIT - IN THE ALTERNATIVE TO COUNTS I AND II
### (ALL DEFENDANTS)

63. All allegations made in prior paragraphs are incorporated by reference, except to the extent inconsistent with the relief requested herein.

64. At the direction of Defendants, Dr. Waseem performed work and provided services to Stability AI from July 2020 through July 2021, as described herein.

65. Defendants authorized or requested the work and services provided by Dr. Waseem, including but not limited to, drafting proposals for grant applications and projects, meeting with investors, and supervising contractors for Stability AI.

66. Dr. Waseem provided the work and services described herein with the reasonable expectation that Defendants would compensate him for such work and services.

67. Defendants knew or reasonably should have known that Dr. Waseem expected to be compensated for the work and services provided to Stability AI.

68. Defendants accepted and retained the benefit of Dr. Waseem's work and services.

69. In agreeing to compensate Dr. Waseem with a 10% equity interest, Defendants understood and agreed that 10% equity interest to be the value of the benefit Dr. Waseem was providing.

70. Defendants wrongfully and intentionally refuse to compensate Dr. Waseem for any of the work he performed or services he provided between July 2020 and July 2021.

71. Consequently, Dr. Waseem is entitled to recover in *quantum meruit* from Defendants in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Dr. Waseem requests that the Court enter judgment in his favor and against Defendants as follows:

A. Enter judgment in favor of Dr. Waseem on Count One against all Defendants, jointly and severally, in an amount to be proven at trial.

B. Enter judgment in favor of Dr. Waseem on Count Two, in the alternative to Counts One and Three, against all Defendants, jointly and severally, in an amount to be proven at trial.

C. Enter judgment in favor of Dr. Waseem on Count Three, in the alternative to Counts One and Two, against all Defendants, jointly and severally, in an amount to be proven at trial.

D. Award Dr. Waseem pre- and post-judgment interest.

E. Award Dr. Waseem all of his costs and expenses in connection with this litigation.

F. Award such other and further relief as the Court deems just and proper.

Dated: January 16, 2024 　　　　　　　　DR. TAYAB WASEEM

　　　　　　　　　　　　　　　　　　　By: 　　　　　　　/s/ *George H. Bowles, Sr.*

George H. Bowles, Sr. (VSB No. 38574)
WILLIAMS MULLEN
999 Waterside Drive, Suite 1700
Norfolk, Virginia 23510
Telephone: (757) 622-3366
Facsimile: (757) 629-0660
gbowles@williamsmullen.com

Amanda Bird-Johnson – (VSB No. 92110)
WILLIAMS MULLEN
Williams Mullen Center
200 South 10th Street, Suite 1600
Richmond, VA 23219
Telephone: (804) 420-6346
abird-johnson@williamsmullen.com

　　　*Counsel for Dr. Tayab Waseem*

17